**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| DANIEL LEE DYKES, | : | |
| Plaintiff, | : | Case No.  3:06CV029 |
| vs. | : | Magistrate Judge Sharon L. Ovington (By consent of the parties) |
| WOLOHAN LUMBER, CO., *et al*., | : | |
| Defendants. | : | |

**DECISION AND ENTRY**

**I.     INTRODUCTION**

Plaintiff Daniels Lee Dykes, a resident of Dayton, Ohio, brings this case *pro se* claiming that his former employer, Defendant Wolohan Lumber Co., harassed and discriminated against him in violation of his rights under federal law.  The sole remaining Defendant at this point in the case is Wolohan Lumber.

The case is before the Court upon Wolohan Lumber's Motion for Summary Judgment and Memorandum and Exhibits in Support (Doc. #38), Plaintiff's Response and Supporting Exhibits (Doc. #40), Wolohan Lumber's Reply (Doc. #41), and the record as a whole.

**II.    BACKGROUND**

   **A.     Plaintiff's Pleadings**

Plaintiff states in his Amended Complaint that Wolohan Lumber employed Plaintiff from June 1999 to late July 2004.  (Doc. #4 at 2).  His final job with Wolohan Lumber was "Lead

Man" in the stair shop.  *Id.*

Plaintiff alleges in his Complaint, "I was fired for giving verbal 2 wk. notice.  I gave the notice after Shawn Miller[1] told me that I was a problem employee for complaining about Mark Danley trashing my work area, because I refused to be Mark[']s maid."  (Doc. #2 at 5)(footnote added).  Plaintiff further alleges that he had previously informed Wolohan Lumber that he suffered from a bipolar disorder, and he alleges that his co-workers knew he suffered from a bipolar disorder.

Plaintiff explains, "Shawn was harassing me over a relationship between his daughter and my nephew."  *Id.*  Plaintiff reported to managers that Shawn had harassed him in many ways by not giving him support from other departments, by loaning out tools he needed to do his job, and by requiring him to keep his work area spotlessly clean "while allowing others to be slobs."  *Id*. at 5-6.

Plaintiff's Complaint and Amended Complaint detail his various accomplishments during his employment with Wolohan Lumber such as raising production levels and reducing labor costs.  (Doc. #2 at 6; Doc. #4 at 3).

Plaintiff seeks an award of $250,000.00 "more or less," and an Order preventing "this type of thing from happening again," and an Order requiring Wolohan Lumber to apologize in writing its "part in helping Shawn with his crusade." (Doc. #2 at 8).

### B.     Incident Reports

During Plaintiff's employment with Wolohan Lumber he experienced conflicts with his co-workers.  Incident reports document that he was involved in disputes relating to the

---

[1] Shawn Miller was a Wolohan Lumber supervisor during Plaintiff's employment.

following: Plaintiff's effort to repair a door (February 2001); an argument and fight Plaintiff had with a co-worker (October 2001); an incident when Plaintiff angrily stormed out of the office after his supervisor instructed him to keep the garage door closed (October 2003); Plaintiff's threat to block co-workers' work spaces so he could "teach them a lesson" (December 2003); an incident when Plaintiff tipped over stairs and dumped containers of sawdust on the floor (March 2004); Plaintiff's complaints that his co-workers were "deliberately sabotaging his work progress" (April 2004); Plaintiff's failure to follow instructions to assist another employee (May 2004); and an incident when Plaintiff went into a "15 minute long tirade about people intentionally trying to get in his way and basically sabotaging his ability to produce" (May 2004). (Doc. #38, Exh. 5).

### C. Bipolar Disorder and Medical Leave

The problems described in the incident reports occurred before Plaintiff applied, in May 2004, for Social Security disability benefits due to a "Bipolar disorder and ... hernia stuff." (Doc. #38, Exh. 1 at p. 12). Plaintiff testified during his deposition that before May 10, 2004, he did not know about bipolar disorder, did not know that he suffered from it, and would not have told anyone at work about having it before May 10, 2004. *Id*. at pp. 12-13.

Plaintiff informed Wolohan Lumber on May 10, 2004 that he suffered from a bipolar disorder. Yet, he also presented Wolohan Lumber with medical verification indicating both that he was able to work with no restrictions and that his "[c]urrent medications pose no safety problems with operating machinery or motor vehicles." (Doc. #38, Exh. 6).

On May 10, 2004, in response to his request for a leave of absence, Wolohan Lumber sent Plaintiff a short-term disability benefits form, a Certification of Physician or Practitioner

3

form, and a form for requesting leave under the Family and Medical Leave Act (FMLA). (Doc. #38, Exh. 8). Wolohan Lumber also sent a letter to Plaintiff informing him that his leave of absence request had been "tentatively designated as a FMLA leave, pending the completed FMLA Request Form and the Certification of Physician or Practitioner Form." *Id*.

In May 2004, Plaintiff's short-term disability insurer denied his request for benefits because he had not provided the insurer with additional information it had requested. *Id*.

On June 9, 2004, Wolohan Lumber sent Plaintiff a letter denying his request for final designation of his absence from work as FMLA leave, because he had not completed and returned the required forms. *Id*.

      **D.**     **Plaintiff's Complaints To Wolohan Lumber**

Between the dates of May 5 and May 10, 2004, Plaintiff telephoned a number of individual Wolohan Lumber stores in Michigan and Ohio raising several complaints. *See* Doc. #4 and attached Exhibits. During his deposition, Plaintiff characterized this as when he "snitched on them to corporate." *E.g*., Doc. #38, Exh. 1, pp. 37-38. Plaintiff's phone messages were passed to Pete Hartmann, who supervised various Wolohan Lumber stores, including the store where Plaintiff worked.

Hartmann spoke with Plaintiff, *see id*., Exh. 1, p. 67, and wrote a memorandum to Plaintiff's personnel file describing the substance of Plaintiff's complaints as follows:

    1.     Shawn Miller had questioned Plaintiff about the relationship of his nephew and Shawn's daughter, who were schoolmates;

    2.     Shawn directed other employees to use tools and equipment that Plaintiff was using, thus causing his work to slow down;

    3.     One of Plaintiff's coworkers was a slow, poor worker;

  4.  Plaintiff's request for overtime work was denied because he had ordered a pizza[2] for delivery and was eating this pizza while he was making stairs (a safety violation); and

  5.  Plaintiff was instructed to move racking and was asked why he did not wait for help.

(Doc. #38, Exh. 7)(footnote added).  During this conversation, Plaintiff asked for, and was granted, two vacation days.  He returned to work the following Monday.  *Id*.

### E. Additional Incidents

Plaintiff alleges that four incidents occurred after the date when he informed Wolohan Lumber about his bipolar disorder:

  1.  A Wolohan employee refused to let Plaintiff buy an employee shirt;

  2.  Plaintiff was held to a higher standard in keeping his work area clean;

  3.  Plaintiff's supervisors worked him too hard; and

  4.  Wolohan Lumber accepted Plaintiff's resignation without allowing him to work the additional two weeks.

*Id*. at pp. 39-41.

Plaintiff acknowledged during his deposition that he was able to complete all the work assigned to him.  *Id*. at p. 96.  He also acknowledged, later in his deposition, that the events involving extra work assignments and refusal to provide him with help occurred well before he told Wolohan Lumber about his bipolar disorder.  *Id*. at p. 108.

Plaintiff concedes that after May 2004, no one at Wolohan Lumber called him names related to his bipolar disorder with the exception of one employee who said he was "quirky."  *Id*.

---

[2]  Plaintiff testified that Hartmann "got this thing wrong ... because the little pizza incident ... I wasn't building stairs and eating pizza.  I never even took a bite of that pizza.  I threw it away."  (Doc. #38, Exh. 1, p. 66).

at pp. 62, 108-09.

### F. Plaintiff's Final Day With Wolohan Lumber

On July 29, 2005, after Plaintiff experienced a problem with his co-workers, he notified Wolohan Lumber, "in the heat of the moment," of his intent to resign in two weeks. (Doc. #2 at 6). Although Plaintiff disputes that he resigned, he acknowledges that he told Shawn Miller, "Fine, Shawn, you've got my two-weeks notice. Meeting adjourned." (Doc. #38, Exhibit 1 at p. 25; *see* Doc. #4 at 6).

During his deposition, Plaintiff described the events of his last day with Wolohan Lumber as follows:

> I was trying to preserve myself. They had set me off. What do you want me to say? I mean, that's what happened. Mark[3] makes this big mess, and Shawn tells me I have to clean the mess up. I have to do all this stuff for the door shop, and then he takes me up there to punish me over a mess I didn't make.
>
> They know I'm bipolar, and they know I got these issues. They know I'm going to defend myself, and then he takes me in there and starts that cocky little attitude after all the greasing he did on the way up there. And then I go and spout off because I don't know what else to say because I'm angry and frustrated. I got confused. I started – I couldn't breathe and I'm mad and everything.
>
> Then I calmed down after lunch. I left out of his office. I went to lunch; and when I was cooling off, I came back, and then they fired me.

(Doc. #38, Exh. 1 at 69-70)(footnote added).

Shawn Miller describes the same incident as follows:

> On Thursday July 29 @ 10:30 am Dan Dykes approached me and said that he had just finished bitching to Pat and that he needed to talk to me. He then asked me if someone has been here less than a year should he have to follow orders. I said that it depended on who the person was and what position they held. He then proceeded to tell me how he is one man and he does all the stairs,

---

[3] This refers to Mark Danley, one of Plaintiff's co-workers.

6

>helps load trucks, keeps his area clean, and loads customers. He said that he rips tread stock down and saves the bottoms for doors and that Mark Danley had asked him why doesn't he put the door bottom stock away too. He then said that Danley was always questioning why he doesn't empty the trash too. He then said that Mark Danley was not a 134 pound Chris Ernst and that this time he wouldn't get just some of him he would get all of him. He then said if someone doesn't talk to Mark and tell him to back off that it would happen. I then told him to take a break and I would talk to Frank....

(Doc. #38, Exh. 9) (emphasis in original). Plaintiff characterizes this description as a "complete fabrication."[4] (Doc. #38, Exh. 1 at p. 47).

Plaintiff agrees with the following statement by Mark Danley:

>On Dan's last day at Wolohan we were arguing about whether or not he should dump the dumpster (a regular argument for us) and put the door bottoms into individual bins. He said he wouldn't because he had too much to do already. He left the work area and while he was gone I knocked over the stack of door bottoms. When he saw them he got angry and stormed out of the work area. He brought Shawn Miller back with him. They had words but I couldn't hear what they were saying over the noise in the shop, but it looked like they were arguing. Shawn left and came back a little while later and took Dan with him. Next thing I know, Frank Wharling tells me to go behind shed 3 because Dan was making threats against me. I don't believe that Dan threatened me but I believe I made him mad. I am sorry for that.
>
>We became friends at work, and we are friends today. Dan bought me and others lunch a few times and brought Chris Pass to work every day. Mgt. made Dan rip door bottoms for us, and they didn't replace his helper. Keith made him band up stairs and load trucks (when the drivers or load builders could have) and he had to rip his own OSB instead of the panel shop doing it for him. I remember how Dan could predict when and how Shawn would harass him next especially the time he predicted Shawn would make him move the stairs from the storage area he made because it would make his job harder. It was weird how he knew. It was obvious to me that Shawn had a problem with Dan even though he came to work regularly and worked hard even while suffering abdominal pains.

(Doc. #4, Exh. 3A). During his deposition, Plaintiff testified that Mark Danley's statement was

---

[4] Because of Plaintiff's testimony, the Court does not accept as true Miller's description of these events, and it plays no analytical role in the following summary-judgment analysis. Miller's description is included here merely to further reflect the difficulties Plaintiff experienced with Miller.

"the truth." (Doc. #38, Exh. 1 at 46).

### G. Additional Evidence

Plaintiff acknowledged during his deposition that he never asked anyone at Wolohan to reasonably accommodate his disability, but he explains, "They didn't give me an opportunity." (Doc. #38, Exh. 1, p. 72).

During his deposition, Plaintiff proposed the following reasonable accommodations:

> One thing they could have done was tell Mark 'hey you know he's got a problem. It's not like it was a secret. You can't go messing with people that got a problem like that.'
>
> And Shawn could have said, 'look Dan, I know you're doing a lot of work;' but they didn't want to do that....

*Id.*

During Plaintiff's deposition, the following colloquy occurred concerning whether or what evidence Plaintiff had in support of his disability discrimination claim:

> Q. What I'm looking for today is what evidence you have that – the reason from May of '04 forward that these things occurred because you had a disability, not because of your nephew and Shawn's daughter but because of the disability.
>
> A. Well the outburst was the disability, that was a result of my disability, that was the outburst, they were aware of the disability, they didn't need to let me go. If they didn't know, I mean, come on, Pat's wife is a nurse, Pat's daughter is a nurse, I'm sure they're well educated on bipolar or semi-educated and at least know where to look....
>
> Q. Okay but you don't have any evidence as we sit here today that any of the individuals whom you named as defendants in this matter actually discussed your disability with their spouses or daughters, correct?
>
> A. I don't know what they did.... All I know is that they were aware of my disability....

(Doc. #38, Exh. 1 at pp. 74-75).

8

Plaintiff further testified that Wolohan Lumber should have ignored his outburst and should have let him work the two weeks remaining after his two-week notice. *Id*. at pp. 75-76.

Plaintiff's employment with Wolohan Lumber ended on or near July 29, 2004. *See* Doc. #28 at 7; *see* Doc. #4 at 6 (stating Plaintiff was employed until August 2004).

### III. SUMMARY JUDGMENT STANDARDS

The central issue presented by a Motion for Summary Judgment is a threshold issue – whether the case presents a proper jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A moving party is entitled to summary judgment in its favor if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson*, 477 U.S. at 247.

"The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). If the movant makes this showing, the non-moving party may not rely on the bare allegations of the Complaint but must present affirmative evidence in support of his or her claims. *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992); *Street*, 886 F.2d at 1479-80.

Because Plaintiff is proceeding *pro se*, the Court must construe his Complaint and Amended Complaint liberally in his favor. *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993). The Court, however, is not required "to search the entire record to establish that it is bereft of a

9

genuine issue of material fact." *Id*. at 404; *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *Street*, 886 F.2d at 1479-80. Rather, the burden falls on Plaintiff at this stage of the litigation to designate specific facts or evidence in dispute. *Anderson*, 477 U.S. at 250; *Metiva*, 31 F.3d at 379; *Guarino*, 980 F.2d at 404-05; *Street*, 886 F.2d at 1479-80.

Ultimately, the Court must determine at the summary-judgment stage whether the evidence presents a sufficient factual disagreement to require submission of the challenged claim or claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *Little Caesar Enterprises*, 219 F.3d at 551.

**IV.  DISCUSSION**

    **A.  Plaintiff's ADA Claims**

**1.**
**The Parties' Contentions**

Construing Plaintiff's *pro se* pleadings liberally in his favor, he claims that Wolohan Lumber violated his rights under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101, *et seq*., by permitting co-workers or supervisors to harass him and by terminating his employment because of his bipolar disorder.

Wolohan Lumber contends that it is entitled to summary judgment on Plaintiff's ADA claims because (1) Plaintiff was not a protected person under the ADA during his employment with Wolohan Lumber; (2) Plaintiff never requested a reasonable accommodation; and (3) Plaintiff has admitted his "termination" was not solely based on his disability.

10

## 2.
## ADA "Disability"

Under the established framework for deciding discrimination cases ... forth in a plaintiff establishes a prima facie case of disability discrimination if [he] proves that (1) [he] was 'disabled' within the meaning of the Act; (2) [he] was qualified for the position, with or without an accommodation; (3) [he] suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced [him] or was selected for the position that the disabled person had sought.... If the plaintiff establishes the elements for a prima facie case, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff.... If the defendant carries that burden of production, plaintiff must then prove 'by a preponderance of the evidence' that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination.... More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions....

*Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 882-83 (6th Cir. 1996) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 ... (1981))(other citations omitted).

To demonstrate a *prima facie* case of disability discrimination, Plaintiff must present evidence indicating that he was "'a qualified individual with a disability' *at the time of the discriminatory act*." *Kocsis*, 97 F.3d at 884 (footnote omitted)(emphasis in original). There is no genuine dispute over the fact that Plaintiff did not know that he was suffering from a bipolar disorder before May 10, 2004 and that he consequently did not inform Wolohan Lumber about his bipolar disorder until this time. Plaintiff's allegations concerning any acts taken by his Wolohan Lumber co-workers and supervisors before May 10, 2004 did not violate the ADA.

11

*See Kocsis,* 97 F.3d 884, n.13 (and cases cited therein).

On or near May 10, 2004, Plaintiff informed Wolohan Lumber about his bipolar disorder and that he was on medication to treat this disorder. *See* Doc. #38, Exh. 6. He provided Wolohan Lumber with medical verification indicating both that he was able to work with no restrictions and that his "[c]urrent medications pose no safety problems with operating machinery or motor vehicles." (Doc. #38, Exh. 6). It is undisputed that Plaintiff told his co-workers he had been diagnosed with bipolar disorder. (Doc. #38 at 15).

Assuming, in Plaintiff's favor, that his medical verification adequately informed Wolohan Lumber about his bipolar disorder and that he was taking prescription medication for that disorder, the record lacks further medical evidence about the severity of Plaintiff's bipolar disorder. Such medical evidence is essential because Plaintiff cannot show he is under an ADA protected "disability" by a mere diagnosis or by the presence of an impairment. *See Toyota Motor Mfg. v. Williams*, 534 US 184, 195 (2002); *see also Burnett v. LFW Inc.*, 472 F.3d 471, 483 (7th Cir. 2006) ("even though [the plaintiff] suffered from undiagnosed prostate cancer, that fact alone does not prove that he was disabled under the ADA.").

In order to be a qualified individual with a disability, Plaintiff must present affirmative evidence showing that he suffers from a "disability" as defined under the ADA. *See* 42 U.S.C. §12112(a). The ADA defines the term "disability," in part, as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual...." 42 U.S.C.

12

§12102(2)(A).[5] "Substantially limits," under the ADA, means a significant restriction in the individual's ability to engage in a major life activity as compared to others. *See Toyota Motor*, 534 US at 195-96.

Plaintiff has not produced evidence indicating that, during his employment with Wolohan Lumber, he suffered from an impairment which substantially limited his ability to engage in any major life activity. Perhaps the most favorable evidence for Plaintiff's on this point is his deposition testimony that his altercations with co-workers were a result of his bipolar disorder. Yet, regardless of how sincerely Plaintiff believes this, he is not competent to testify about a possible causative connection between his problems with co-workers or supervisors and his bipolar disorder. Under Fed. R. Evid. 701, lay opinion testimony is not permitted when it is based on this type of scientific, technical, or other specialized knowledge. Resolution of the issue of whether Plaintiff's bipolar disorder was the driving force behind his problems with his co-workers or supervisors requires specialized medical or psychiatric knowledge. Consequently, Fed. R. Evid. 701 renders Plaintiff's testimony on this point insufficient to create a genuine issue of material fact. Plaintiff, moreover, never communicated to anyone at Wolohan Lumber that his outbursts or other problems were caused by his bipolar disorder. *See, e.g.*, Doc. #38, Exh. 7.

---

[5] Since Plaintiff has alleged throughout this case that he has a disability, the remaining definitions in §12102(a) do not apply. *Cf. Sullivan v. River Valley School Dist.*, 197 F.3d 804, 814 (6th Cir. 1999)("The ADA simply does not protect an employee from an employer's knowingly false accusation of having a disability. Rather, it protects employees from employers who mistakenly treat them as if they have a disability.").

13

Accordingly, Wolohan Lumber is entitled to summary judgment, because Plaintiff has not met his burden of producing affirmative evidence showing that he is a "qualified individual with a disability" – an essential element of his ADA claim. *Cf. Swanson v. University of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001)("Overall, [the plaintiff's] vague allegation of the unknown duration of his depression and effects of his medication, when viewed with the demonstrated effects of his treatment, fails to establish that he was substantially limited in his sleep, concentration, or communication." (citation omitted)).

### 3.
### Reasonable Accommodation

Even if the Court concluded that Plaintiff was a "qualified individual with a disability," due to his bipolar disorder, he also must produce affirmative evidence indicating that he asked Wolohan Lumber for a reasonable accommodation of his bipolar disorder. As the United States Court of Appeals for the Sixth Circuit has explained:

> The applicable EEOC regulations provide that it is 'unlawful for a covered entity not to make reasonable accommodation to the *known* physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.' 29 C.F.R. § 1630.9(a)(emphasis added). The Commission's interpretive guidelines indicate that generally 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.' 29 C.F.R. pt. 1630 App. § 1630.9. 'Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.' *Id*. There is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the

14

employee's disability or the employee's need or desire for an accommodation

*Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998)( footnote omitted).

In the present case, the record contains no genuine dispute over the fact that Plaintiff did not ask Wolohan Lumber for a reasonable accommodation of his bipolar disorder. Plaintiff acknowledged as much during his deposition, but explained, "They didn't give me an opportunity." (Doc. #38, Exh. 1, p. 72). Yet, Plaintiff does not indicate any fact or circumstance indicating that Wolohan Lumber declined to give him an opportunity to request a reasonable accommodation. The record instead contains Hartmann's memo of May 19, 2004, which establishes that Plaintiff was permitted to raise his complaints about his co-workers and supervisors. In the absence of conflicting evidence, this establishes that Wolohan Lumber provided Plaintiff with at least one significant and fair opportunity to request a reasonable accommodation. *See* Doc. #38, Exh. 7. In addition, Plaintiff does not allege that he requested a reasonable accommodation of his bipolar disorder, and Hartmann's rather detailed memo does not document any such request. *See* Doc. #38, Exh. 7; *see also* Plaintiff's deposition, Doc. #38, Exh. 1, pp. 66-70. For these reasons, no jury could reasonably conclude that Wolohan Lumber denied Plaintiff an opportunity to request a reasonable accommodation of his bipolar disorder.

As to the particular accommodation that Plaintiff believes Wolohan Lumber should have provided, he simply believes that Wolohan "should have known" that they needed to "back off," and that they should have known that a person with bipolar disorder would get angry and "flare

15

up." (Doc. #38, Exh. 1, pp. 74-75). Plaintiff, however, never informed Wolohan Lumber that his anger or flare-ups were caused by a bipolar disorder. In addition, to accept Plaintiff's argument would require – contrary to the ADA – placing employers in the position of predicting the generalized effect of bipolar disorder, rather than requiring employers to address the specific facts and circumstances concerning such an impairment as well as any proposed reasonable accommodation. By enacting the ADA, Congress sought to prohibit such workplace generalizations – particularly, striving to prohibit employers from basing employment decisions upon pre-conceived, non-individualized assessments of what an employee's impairment may entail. This goal not only underlies the ADA's anti-disability discrimination provision, 42 U.S.C. §12112(a), it is further seen throughout the findings and purposes listed by Congress in support of the ADA. 42 U.S.C. §12101(a), (b). Congress, for example, recognized that "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypical assumptions not truly indicative of the individual ability of such individuals...." 42 U.S.C. §12101(a)(7). In light of this, to conclude, as Plaintiff suggests, that Wolohan Lumber knew, or should have known, that Plaintiff's bipolar disorder caused his anger or flare-ups – without additional evidence regarding the severity of Plaintiff's bipolar disorder, which the record lacks – would be contrary to the

16

ADA.

It is, moreover, well established that an employer is not required to speculate about the seriousness or extent of an employee's disability or the employee's need or desire for accommodation. *See Gantt,* 143 F.3d at 1046-47. At a minimum, the employee must put the employer on notice that any deficiency in their performance is related to an ADA "disability." *See Brenneman v. MedCentral Health System*, 366 F.3d 412, 420 n.4 (6th Cir. 2004) ("While plaintiff claimed that he would often relay this explanation when he was experiencing diabetes-related illnesses, this statement would not have <u>reasonably apprised</u> defendant that the absences were related to a disability rather than some general illness." (emphasis added) (citation omitted)); *cf. Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997)(ADA plaintiff bears the initial burden of proposing a reasonable accommodation and showing it is objectively reasonable).

The present case is similar to *Gantt v. Wilson Sporting Goods Co.*, where the plaintiff, like Plaintiff in the instant case, never requested accommodation. 143 F.3d at 1047. Although the plaintiff in *Gantt* had been off work for a year because of illness, her failure to ask for an accommodation was fatal to her claim that her employer failed to accommodate her disability. *Id*. Similarly, in the present case, for the reasons stated previously, the record lacks a genuine issue concerning the fact that Plaintiff did not request a reasonable accommodation and that Wolohan Lumber did not fail to provide Plaintiff with an opportunity to do so.

17

Accordingly, Wolohan Lumber is entitled to summary judgment on Plaintiff's ADA reasonable accommodation claim.

### 4.
### Termination of Plaintiff's Employment

Plaintiff emphasized during his deposition that the "great big issue at hand is what I said in the heat of the moment on or about August the 1st after being provoked. Everybody was aware that I had this disorder. That's the issue at hand. They didn't want to accommodate that disorder; therefore, they let me go. They thought they found their loophole." (Doc. #38, Exh. 1, p. 68; *see supra*, §II(F)).

Even assuming, however, that all the employees and supervisors involved in the incident leading to Plaintiff's termination[6] knew about his bipolar disorder, the record lacks evidence indicating that the "big wigs" (Plaintiff's phrase) who made the decision to terminate his employment intended to discriminate against him because of his disability. In addition, there is no genuine dispute that Plaintiff's outburst or flare-up on his last day of employment constituted a legitimate, non-discriminatory reason to terminate his employment. He must, therefore, show that this reason constituted a pretext for disability discrimination. Plaintiff merely alleges that

---

[6] The Court accepts in Plaintiff's favor his assertion that Wolohan Lumber terminated his employment by not accepting his two-week notice and not permitting him to return to work after he gave two-weeks notice.

18

Wolohan Lumber knew about his bipolar disorder and therefore knew he was subject to such outbursts or flare-ups. This is insufficient to show pretext or to create a genuine issue of material fact concerning pretext. To establish pretext, Plaintiff must show either that the legitimate, non-discriminatory reasons for his termination (1) had no basis in fact; or (2) did not actually motivate his termination; or (3) was insufficient to motivate his termination. *See Kocsis*, 97 F.3d at 883. The record does not contain affirmative evidence supporting any of these methods of showing pretext. Without such evidence, Wolohan Lumber is entitled to summary judgment on Plaintiff's claim that the termination of his employment constituted disability discrimination in violation of the ADA. *See Kocsis*, 97 F.3d at 883; *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (race discrimination case)(to show pretext, a plaintiff "must allege more than a dispute over the facts upon which the discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment decision.").

      **B.**    **Plaintiff's State Law Claims**

Any disability discrimination claims Plaintiff seeks to raise under Chapter 4112 of the Ohio Revised Code are subject to the same legal standards and analysis as his ADA claims. *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n.2 (6th Cir.

2000) ("[b]oth federal and Ohio disability discrimination actions require the same analysis."). Consequently, for the reasons stated above, *supra*, §IV(A), Wolohan Lumber is entitled to summary judgment on Plaintiff's claims of disability discrimination in violation of Ohio statutory law.  Lastly, because all of Plaintiff's federal claims will be dismissed with prejudice, the Court declines to exercise supplemental jurisdiction over any additional claims Plaintiff seeks to raise under Ohio law.  *See* 28 U.S.C. §1367(c)(3).

## IT IS THEREFORE ORDERED THAT:

1. Wolohan Lumber's Motion for Summary Judgment and Memorandum and Exhibits in Support (Doc. #38) is GRANTED; and

2. The case is terminated on the docket of this Court.

April 19, 2007                                                      s/Sharon L. Ovington
                                                                      Sharon L. Ovington
                                                                      United States Magistrate Judge

20